June 22, 2017

**Supreme Court**

No. 2015-91-Appeal.
(P14-11-1)

In re Adrina T.                          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Adrina T.            :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court**.  The respondent mother, Briana Hebert, appeals from a decree of the Family Court finding: (1) that Ms. Hebert failed to provide her daughter, Adrina T., "with a minimum degree of care, supervision, or guardianship[;]" (2) that Adrina was "without proper parental care and supervision[;]" (3) that Ms. Hebert "inflicted or allowed to be inflicted upon [Adrina], physical injury[;]" and (4) that Ms. Hebert "created or allowed to be created a substantial risk of physical injury to [Adrina]."  This case came before the Supreme Court for oral argument on January 25, 2017, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time.

For the reasons set forth in this opinion, we vacate the decree of the Family Court as it pertains to Briana Hebert.

-1-

# I

## Facts and Travel

On January 2, 2014, the Department of Children, Youth and Families (DCYF) filed a petition in Family Court, alleging that Ms. Hebert and William Tirocchi[1] "neglected" and "abused"[2] their daughter, Adrina (who was born on September 22, 2013). In that petition, DCYF specifically alleged the following: (1) "That the parents * * * failed to provide [Adrina] with a minimum degree of care, supervision, or guardianship[;]" (2) "That [Adrina] [wa]s without proper parental care and supervision[;]" (3) "That the parents * * * inflicted or allowed to be inflicted upon [Adrina], physical injury[;]" and (4) "That the parents * * * created or allowed to be created a substantial risk of physical injury to [Adrina]."

A trial on the above-summarized petition was held before a justice of the Family Court on various dates from June to September of 2014. We relate below the salient aspects of what transpired at that trial.

---

[1]    The appeal of William Tirocchi, Adrina's father, will be heard separately at a later date. Accordingly, the instant opinion addresses solely Briana Hebert's appellate contentions.

[2]    General Laws 1956 § 40-11-2(1) defines an "[a]bused and/or neglected child" in relevant part as follows: "a child whose physical or mental health or welfare is harmed, or threatened with harm, when his or her parent or other person responsible for his or her welfare:

> "(i) Inflicts, or allows to be inflicted, upon the child physical or mental injury, including excessive corporal punishment; or
> "(ii) Creates, or allows to be created, a substantial risk of physical or mental injury to the child, including excessive corporal punishment[.]"

# A

## The Testimony at Trial

### 1. The Testimony of Briana Hebert

Ms. Hebert, Adrina's mother, took the stand in her own defense. She testified that she had been in a relationship with her boyfriend, Mr. Tirocchi, for more than seven years; and she said that, as of the time of trial, she was employed as a school bus driver.

Ms. Hebert proceeded to testify that, in the early afternoon of December 31, 2013, she was at her apartment with "Mr. Tirocchi, [her] niece, and the baby, Adrina," whom she described as then being "over three months [old]." She stated that her niece left the apartment by 1:00 p.m. and that, at approximately 4:40 p.m., she left Mr. Tirocchi in the apartment with Adrina so that she might go to "the liquor store and then the grocery store." (She added that the former was a three-minute drive from her apartment, while the latter was right across the street.) She further testified that, between approximately 4:45 and 4:50 p.m., as "[she] was walking in the front door" of the grocery store, "Mr. Tirocchi had called [her] and told [her] that the baby had fallen off the bed and she was crying and she was most likely hurt." Ms. Hebert stated that she "stayed on the phone with Mr. Tirocchi" and "returned home" by car within two or three minutes. On cross-examination, she acknowledged that, by the time she entered her car upon leaving the grocery store, she knew that 911 had already been called concerning Adrina.

Upon being questioned about what happened when she arrived back at her apartment, Ms. Hebert stated: "Mr. Tirocchi was in the bedroom with the baby, and [Adrina] was l[]ying on the bed crying hysterically." Ms. Hebert also added the following:

> "I could tell that [Adrina] was in pain. She was crying like I had never heard her cry before. And I didn't want to touch her or anything because I didn't know if me touching her was going to cause anymore injury to her.

"* * *

"And I could actually hear the sirens, so I knew that the emergency services were on their way."

Ms. Hebert testified that, within approximately a minute after she heard the sirens, the emergency services arrived and took Adrina to the emergency room. She added that she "went in the rescue and Mr. Tirocchi followed in [her] vehicle" to Hasbro Children's Hospital.

According to Ms. Hebert, after arriving at Hasbro Children's Hospital, she and Mr. Tirocchi and the doctors "went into an exam room" with Adrina, who was crying at the time. She stated that she had "never heard [Adrina] cry like that before," so she "knew something was wrong with her." She testified that the baby was X-rayed and was given pain medication, after which the emergency room doctor told her and Mr. Tirocchi that Adrina would be staying overnight for observation. Ms. Hebert added that she and Mr. Tirocchi stayed overnight with Adrina. She further testified that, the following morning (January 1, 2014), she spoke with Dr. Adebimpe Adewusi (see Part I.A.4, infra) about "the history of [her] * * * relationship with Mr. Tirocchi, about the baby, her normal activity and routine and what had happened the day before." Ms. Hebert stated that she explained to Dr. Adewusi that "the baby was very active," that she "move[d] around a lot," and that she once "rolled over from back to [belly]."[3]

It was Ms. Hebert's testimony that, at around 3:00 p.m. on January 1, she spoke with Megan Dunn, a Child Protective Investigator for DCYF. She stated that she explained to Ms. Dunn "what had happened the day before." Ms. Hebert testified that, at around 6:00 p.m. on that same day, officers of the Johnson Police Department came to her apartment and had her

---

[3] On cross-examination, Ms. Hebert testified that, about a month before the incident at issue, in the course of a visit with Adrina's pediatrician, Dr. Thomas Puleo, she "had told him that [Adrina] had rolled over." She stated that she had also relayed this information to Megan Dunn, a Child Protective Investigator for DCYF.

accompany them to the station for questioning. She stated that she cooperated with the police because she "felt like" there was "nothing to hide."

During her testimony on direct examination, Ms. Hebert was asked about Mr. Tirocchi; and she said that they had "a very good relationship" and were "really good friends." In addition, Ms. Hebert testified that she had previously left Adrina in the sole care of Mr. Tirocchi "at least, between five and ten times," for periods ranging from two to three hours. She indicated that she had absolutely no concerns about his care of Adrina. When asked if she felt comfortable leaving Adrina with Mr. Tirocchi on the day of the incident, Ms. Hebert responded in the affirmative because she had "seen" how he interacted with the baby for three months. She added that she "found nothing" indicating that Mr. Tirocchi was ever a "threat" to Adrina.

On cross-examination, Ms. Hebert acknowledged that, prior to trial, she had not previously told Dr. Adewusi or Ms. Dunn that she had gone to a liquor store on the day of the incident; however, she pointed out that she had told them that she had been "going on errands," explaining that, "at the time [she] was called [by Mr. Tirocchi,]" she had been at the grocery store. She further testified that she had received a receipt from the liquor store that contained a timestamp indicating her presence there at around 4:45 p.m.; she added that her phone bill would reflect that she had received a call at 4:50 p.m.

### 2. The Testimony of William Tirocchi

Mr. Tirocchi, Adrina's father, testified on his own behalf. He testified that, as of the time of trial, he had been employed as a school bus driver for more than two years.

Mr. Tirocchi proceeded to testify that, on December 31, 2013, at approximately 2:00 p.m., Adrina was placed in her crib to sleep and that, thereafter, he and Ms. Hebert "were just lounging around the house." He stated that, at "[a]round 4:40-ish," Ms. Hebert left to do some

errands[4] "while the baby was sleeping." Mr. Tirocchi testified that, several minutes after Ms. Hebert had left, he heard Adrina "start to fuss in the crib," which indicated to him that she was "waking up." He stated that he "picked [Adrina] up," "placed her on the changing table," and "changed her diaper." It was then Mr. Tirocchi's testimony that the following series of events ensued:

> "I turned around, and I placed [Adrina] on the bed. I walked into the kitchen to see if there was a bottle made or not made. * * * While I was [checking] the refrigerator, I heard a loud bang, and the baby started to scream. I immediately ran into the bedroom, and I found Adrina face up, crying unbelievably. I picked her up from underneath her arms, her armpits, and I placed her on the bed, and I sat down with her on the bed, and I checked her head. I checked her arm, gently -- you know, squeezing, just to see if there was any pain. When I got to her leg, she started crying, you know, just excruciating pain. At that time, [which was approximately 4:50 p.m.,] I called [Ms. Hebert] on my cell phone and told her the situation; to get home immediately. As [Ms. Hebert] was still on the [cell] phone, I [simultaneously] called 911 from my house phone and talked to the paramedics, and [she] came home. The paramedics were there, and they brought the baby to Hasbro."

When Mr. Tirocchi was asked where he had placed Adrina on the bed, he responded: "I placed the baby on the lower, left-hand side of the bed," with her head "towards the middle of the bed" and her feet about six inches from the "edge" of the bed. In his testimony, he explained that he had done so because he thought that Adrina would be "fine" on the bed for approximately "10 [to] 15 seconds," while he checked to see if her bottle was ready.

On cross-examination, Mr. Tirocchi was asked why he had placed Adrina on the bed and not elsewhere, such as back in the crib. He again testified that he did not think that anything would happen during the ten seconds in which he was checking to see if her bottle was ready. It

---

[4] It bears noting that, on cross-examination, Mr. Tirocchi acknowledged that Ms. Hebert had called him while she was at the liquor store. He stated that the reason for her call was to "ask[] [him] what [he] wanted" from that store. However, it was Mr. Tirocchi's further testimony that neither he nor Ms. Hebert consumed alcohol before the incident at issue.

-6-

was further his testimony that "it would have taken longer for [him] to go back to the crib and then go to the kitchen and prepare a bottle for her." According to Mr. Tirocchi, it was his belief that Adrina was "enough on the bed" so that she would "not to be able to * * * fall[] off."

In Mr. Tirocchi's testimony on cross-examination, he acknowledged that "the whole time" during which he was on the landline with the 911 operator, he had also stayed in contact on his cell phone with Ms. Hebert, whom he said he had called first. He also acknowledged that, upon Ms. Hebert's return to the apartment, she did not come over and touch Adrina.

Upon being questioned about Adrina's development prior to the incident at issue, Mr. Tirocchi replied that she had been "a very active baby," especially in the crib. According to him, he and Ms. Hebert had once seen her "roll over fully from her back to her stomach."

### 3. The Testimony of Megan Dunn

Child Protective Investigator Megan Dunn testified that, on January 1, 2014, she was assigned to investigate the allegation of physical neglect (later amended to "[p]hysical abuse with a bone fracture") in the instant case, after having received a call from a "reporter" on the child-abuse hotline. Ms. Dunn stated that, on that same day, she went to the hospital and saw Adrina, who was "awake and smiling" and was surrounded by family members (including Ms. Hebert and Mr. Tirocchi). Ms. Dunn testified that she observed "petechia on the side of [Adrina's] face," which she characterized as meaning "very light red dots." She added that she was unable to see Adrina's legs because they were "covered up" and supported by braces.

Ms. Dunn further testified that, at some point after observing Adrina, she spoke with Ms. Hebert alone. According to her, Ms. Hebert gave the following account as to what had happened:

> "[Ms. Hebert] stated to me that[,] on December 31st * * * in the
> afternoon[,] the baby had gone down for a nap. When the baby

went down for a nap[,] her and dad were the only people home. She told me she left the home at about 4:30 p.m. and left dad home alone with the baby because she was going across the street to the market. And mom told me about what she said was approximately like seven minutes after she left the house she received a call from dad stating the baby fell off the bed and was crying. Mom told me she immediately returned home * * * [from] the store * * *.

"* * *

"[Ms. Hebert] returned home and she told me that dad had already called 9-1-1. When she got home the baby was on the bed crying[,] and the bed was mom and dad's bed that they slept in. She stated she didn't move the child when she came home, but the ambulance was just about getting there and had come in, the paramedics, when she arrived home. She did note that the baby was crying and at that time they went by rescue to the hospital."

Ms. Dunn further testified that, with respect to Adrina's injury, Ms. Hebert could only relay what Mr. Tirocchi had told her (namely, that "the baby rolled off the bed").

Ms. Dunn further testified that Ms. Hebert had stated that Adrina was "a good baby"— one who is "active" and "squirm[s] a lot." By way of example, she explained that, in the words of Ms. Hebert, Adrina would be placed in "one position in the crib" at night, but would "turn[] around facing the opposite way" by morning. Ms. Dunn testified that Ms. Hebert also told her that Adrina "c[ould not] roll over on her own, but she [wa]s able to roll to her side [and] [t]hat she wasn't able to roll over fully to one side, whether it's [on] her stomach or her back." She added that Ms. Hebert did not express any concern to her about Mr. Tirocchi caring for Adrina.

Ms. Dunn further testified that she spoke with Mr. Tirocchi alone, similarly inquiring about the incident at issue. In her words, the following was his version of what happened:

"[Mr. Tirocchi] stated around 4:30 or 5:00 he noticed that the baby was waking up. * * * He went in to get the child and he told me that he took her out of the crib and placed her on a changing table which was later learned to be at the edge, the end of mom and dad's bed. * * * And after he changed her, * * * he told me he placed her on the lower left hand side of the bed. * * * [H]e knew she was hungry and wanted a bottle because she had just woken up

-8-

from her nap. And that he then placed her on the bed from the changing table and went into the kitchen to get a bottle.

"* * *

"[Mr. Tirocchi] told me when he did that he heard a thump. He estimated he was only in the kitchen for about 20 seconds. When he heard that thump he heard the baby crying. He went back to the bedroom and the baby was face up on the floor and she was crying. He picked the child up. I asked him how he picked the child up[,] he said under her arms and he placed her on her back on the bed * * *. And he told me at that point she was crying and he wanted to check her body and he checked her arms and her legs and when he touched her right leg she was crying like he never heard her cry before. He stated to me that her leg clicked when he moved it."

Ms. Dunn stated that Mr. Tirocchi said that he then contacted 911 and also Ms. Hebert "right away." She testified that she repeatedly asked him if he was "sure" about what had happened and whether it was possible that he had grabbed Adrina to prevent her from falling, but that Mr. Tirocchi consistently denied that anything had occurred that differed from what he had already described to her.

Ms. Dunn added that Mr. Tirocchi had described Adrina as being "a good baby"—one who is "active" and "likes to move around." She testified that he told her that Adrina could not "sit up on her own," although she could "roll to her side."

Towards the end of her direct testimony, Ms. Dunn stated that she had measured the distance between the bed and the floor in order to "get an estimate of how far the baby had fallen;" and she recalled that the estimated distance was "28, 29 inches." Ms. Dunn also testified that the comforter on the bed from which Adrina fell was "silky" and generally "smooth."

On cross-examination, Ms. Dunn conceded that she did not "find by a preponderance of evidence" that Ms. Hebert had neglected or abused Adrina. She acknowledged that both Ms. Hebert and Mr. Tirocchi were "fully cooperative" with her and that background checks revealed that neither of them had a criminal record or any prior contact with DCYF. Nonetheless, it

-9-

continued to be Ms. Dunn's view that Adrina's injury was not accidental because she considered it to be "concerning * * * for a child to roll off of a bed and break her femur, which is a large bone in the body that is difficult to fracture."

#### 4. The Testimony of Doctor Adebimpe Adewusi

Doctor Adebimpe Adewusi, the physician who examined Adrina at Hasbro Children's Hospital on December 31, 2013, was a witness for DCYF; she testified as an expert witness, qualified in child abuse and neglect pediatrics. Doctor Adewusi testified that, on January 1, 2014, the day after her initial encounter with Adrina, she took a "detailed history" from Ms. Hebert and Mr. Tirocchi. Doctor Adewusi stated that, at that time, she was told that Adrina "was able to roll to her side but [was] not able to roll completely over."

Doctor Adewusi further testified that, during her examination of Adrina, she observed: (1) that Adrina's right leg "was in pain" when it was manipulated; and (2) that "petechiae" were present on both sides of Adrina's face, which Dr. Adewusi said are "little broken blood vessels." She also testified that, upon reviewing the X-rays of Adrina's right leg and foot, she identified an oblique fracture[5] of Adrina's right femur. According to Dr. Adewusi, "because of [her] concern" regarding a "femur fracture in a nonmobile child" and "the history that [she] was given," she decided to contact DCYF. She added that "th[is] type of fracture * * * cannot occur from a simple fall from the bed." When Dr. Adewusi was asked to clarify her testimony, she replied that Adrina's oblique fracture "need[ed] some sort of torque" or "some sort of rotation to occur." She added that there was "no way the baby could have had that fracture from that fall." Doctor Adewusi stated that, "with that type of fall, * * * the most likely thing to happen is nothing."

---

[5] An oblique fracture is defined as "the line of which runs obliquely to the longitudinal axis of the bone." Stedman's Medical Dictionary 771 (28th ed. 2006). Doctor Adewusi testified that an oblique fracture is "sometimes refer[red] to * * * as a spiral fracture."

She further opined that "the second [likely injury]" could be "a hematoma"—"some sort of bump on the head" (explaining that, "in this age group," the head "is the heaviest part" and is "usually * * * the first thing that makes contact with the ground"). Doctor Adewusi added that "[t]he third likely injury would * * * be something to the head; specifically, a nondisplaced skull fracture * * *."[6] She noted that she was not concerned that Adrina suffered from osteogenesis imperfecta, which she defined at trial as "a genetic disorder" that "cause[s] * * * breaks in the bones."

It was Dr. Adewusi's testimony that, on January 1, 2014, she filed a Physician's Report of Examination, requesting that a hold be issued as to Adrina; she said that she did so because she had "not be[en] provided with the history that fit [Adrina's] injuries." She testified that, in her opinion, "based on [her] clinical knowledge and practice," as well as the history that had been provided by respondents, it was "concerning" that Adrina had petechiae and a femur fracture. Doctor Adewusi stated that her concern was that Adrina's injury was "inflicted."

On cross-examination, Dr. Adewusi conceded that "no magical test" exists to conclude with certainty that a particular type of broken bone is due to an accident as opposed to abuse. However, she stated that her opinion was "based on what is most probable." Doctor Adewusi also testified that, in her experience, "babies don't present to the hospital just from crying with petechiae on their face." When asked whether "it is [her] opinion, to a reasonable degree of medical certainty, that [Adrina's] petechiae could not have been caused by her crying due to the

---

6    On cross-examination, Dr. Adewusi testified that, if the baby had fallen from the bed and had planted her foot on landing, she "would have a different kind of fracture," which she described as "a buckle fracture." She further testified: "I don't know how it would land on its foot first * * * because their head is the heaviest, but if it landed on the foot, * * * it would probably have a buckle fracture; labia of the tibia from the planting of the foot." It was Dr. Adewusi's opinion that, "because of the weight of the [baby]," her head would hit the floor first. However, she did add that "anything is possible, but it's what is probable."

-11-

pain from the injury of her leg," she replied: "Yes." Doctor Adewusi further testified that the following accident-related scenario could have caused Adrina's femur fracture: "[I]f the parents described to [her] that * * * the baby was falling, someone grabbed the leg[,] * * * and the baby then continued to twist around the leg[.]" It was essentially her testimony that "something from the outside" was thus "need[ed]."

### 5. The Testimony of Doctor Thomas Puleo

Doctor Thomas Puleo, who was Adrina's pediatrician, testified on behalf of respondents as an expert witness, qualified in pediatrics. He testified that Adrina had been his patient since "the first week of [her] life." Doctor Puleo stated that Ms. Hebert and Mr. Tirocchi always brought Adrina to all of her scheduled well-visits; he added that Adrina's vaccinations "were administered in a timely fashion." He further testified that, "at the two-month visit[,] in anticipation for the development that occurs between two months and four months," he "normally" warns parents as follows: "Be careful what surface you put them on" because "[a] lot of babies between two and four months begin to roll or move just enough." It was then Dr. Puleo's testimony that, after being notified that Adrina had been admitted to the hospital, he went to see her because she is his patient. When asked about his observations of her, Dr. Puleo responded: "I did not examine Adrina close enough to make a comment."

Towards the end of Dr. Puleo's testimony on direct examination, he was asked whether a three-month-old baby with a broken femur might experience sufficient pain to cry forcefully enough to cause petechiae, to which he answered: "It's physically possible, yes." He testified that, in his interaction with Adrina during previous appointments, he had neither seen nor noted anything about the parents' interaction with Adrina that caused him to be concerned. Doctor

Puleo added that, during his care of Adrina, he had never seen any evidence of neglect and abuse.

On cross-examination, Dr. Puleo testified that, prior to the incident at issue, his last well-visit with Adrina was on November 29, 2013. He acknowledged that, during said visit, he had not noted that Adrina was able to roll over, which is a developmental milestone. It was also Dr. Puleo's testimony that, "depend[ing] on the child's development," "very often between two and four months a lot of babies move around enough to be able to * * * move or squirm * * * to get themselves in a situation to fall or roll off a surface." He added that, if a parent puts a baby on a bed, that baby could fall off the bed, whether the parent stays in the room or leaves it.

### 6. The Testimony of Doctor Jeremy Doak

Doctor Jeremy Doak, who was qualified as an expert in pediatric orthopedics, testified that he first saw Adrina regarding her fractured femur on January 1, 2014. It was his testimony on direct examination that, in his opinion, to a reasonable degree of medical certainty, an oblique fracture could happen "accidentally." He added that "[a]ny type of fall can cause an oblique fracture." Doctor Doak was next asked the following question: "Hypothetically, could a three-month-old [baby] fall off a surface 28 inches high and have a resulting oblique femur fracture?" He answered in the affirmative. Doctor Doak additionally stated: "[T]he higher you fall from, the more likely you are to fracture, but people fall from standing and [they] fracture bones."

It was Dr. Doak's testimony that he could not rule out the possibility that Adrina's injury was "accident[al]" nor that it was "nonaccidental." He added that "any type of fall can cause any number of fractures." According to Dr. Doak, upon his review of X-rays, he stated that "a metaphyseal corner fracture * * * tends to be associated with child abuse," but he said that no

such signs were present with respect to Adrina. He further testified that, based on the radiologic findings alone, he could not determine how Adrina's fracture had occurred.

On cross-examination, Dr. Doak acknowledged that he had written in his report (dated February 2, 2014) that "Adrina's right femur suffered an oblique fracture, which is generally atypical for a nonambulatory patient."[7] (He defined the word "atypical" as meaning "more unlikely than likely.") Doctor Doak further summarized as follows one of the policies of the pediatric orthopedic division of his hospital: doctors must consult with DCYF "if there's a femur fracture in a nonambulatory child" and must do so "[]regardless of the fracture pattern." Towards the end of Dr. Doak's testimony on cross-examination, he testified that, to a reasonable degree of medical certainty, if a child fell from a bed twenty-eight inches high, the injury to the child would not be limited to "only a buckle fracture of the femur." In addition, he noted in his testimony on redirect examination that oblique femur fractures are not necessarily caused by abuse—stating that they "can be caused by any number of things."

**B**

**The Family Court Justice's Decision**

After having reviewed the testimony and other evidence, the trial justice issued a written decision on November 10, 2014. In that decision, she preliminarily noted that Adrina "suffered an oblique femur fracture to her right leg, which is highly unusual in a non-mobile child." The trial justice then expressed "significant concern" relative to the "fact that [Ms. Hebert] was conveniently out of the home at the time of the in[cident], and that [Mr. Tirocchi] had taken full responsibility" for Adrina's injury. From the trial justice's vantage point, "There [we]re too

---

[7] When asked why femur fractures are more frequent in ambulatory children than nonambulatory children, Dr. Doak replied: "Because they're more likely to fall, trip, [and] get injured" from running and walking, which activities he noted they are able to do on their own.

many unanswered questions" and "too many answers that d[id] not fit the facts as presented, including [Adrina's] resulting injury * * *." Having reviewed the medical testimony at trial, she was unpersuaded by the contention that Adrina fell off the bed; instead, she was "convinced" that Adrina's injury was "anything but accidental." Although the trial justice remarked that she was "not certain as to how this injury occurred," she nonetheless found that there was "no medical explanation to support the parents' contention" (i.e., that Adrina was injured as a result of a fall from the bed). The trial justice ultimately concluded that there was "no doubt * * * that both parents know how this injury occurred but neither parent has told the truth * * *."

The trial justice proceeded to cite to the cases of In re Vannarith D., 731 A.2d 685 (R.I. 1999), and In re Chester J., 754 A.2d 772 (R.I. 2000). Drawing on language contained in those two cases, the trial justice expressed her understanding that the state need not prove "which parent actually inflicted the abuse" in view of the principle that "[d]rawing inferences from established facts is an elementary tenet of judicial fact-finding." See In re Chester J., 754 A.2d at 777-78. She further observed that "[a]llowing parents to ignore or stand by while * * * abuse and neglect occurs is tantamount to the parents inflicting the abuse themselves." See id. at 778. The trial justice proceeded to explain as follows why she "d[id] not believe either parent:"

> "[I]t [is] very unusual and somewhat bizarre that the father allegedly left the baby on the bed unattended when there were so many other safe places to put this child and that father would be on the cell phone with mother and on the land line with 911 simultaneously after the alleged injury. Adding to that is the bizarre and unusual testimony and actions of the mother -being out of the house at exactly the time of the injury; making a call to the father from the liquor store but not disclosing that prior to the trial; not stating the child's name through her entire testimony; her reaction upon her coming back to the house and seeing her daughter allegedly screaming in pain on the bed yet not going over to her to touch, hug, hold or console her; having never reported to anyone prior to the date of the injury occurring that the child had rolled over on her own."

-15-

Ultimately, "[b]ased on the medical evidence and [trial] testimony," the trial justice concluded that there were "absolutely no facts" supporting the parents' explanation that Adrina had fractured her femur as a result of a fall from the bed. In the judgment of the trial justice, "[t]he uncontradicted medical testimony supports the State's allegation of abuse and neglect."

The trial justice made the following findings of fact with respect to both parents, indicating that said findings had been proven by clear and convincing evidence: (1) "The parents have failed to provide said child with a minimum degree of care, supervision, or guardianship[;]" (2) Adrina "is without proper parental care and supervision[;]" (3) "[T]he parents have inflicted or allowed to be inflicted upon [Adrina], physical injury[;]" and (4) "[T]he parents have created or allowed to be created a substantial risk of physical injury to [Adrina]." The trial justice further found that Adrina was "Neglected and Abused as to mother and father;" and she proceeded to order that Adrina be committed to the care, custody, and control of DCYF. Each parent filed a timely notice of appeal.

## II

### Standard of Review

At the outset, we note that the pertinent standard set forth in Rule 17(b) of the Family Court Rules of Juvenile Proceedings reads as follows: The "[d]etermination that a child is abused, neglected, or dependent shall be made upon clear and convincing evidence." Rule 17(b) further instructs "[t]he court * * * [to] clearly state the facts upon which it bases such determination and its reasons therefor." Also, the clear and convincing standard "requires that the fact-finder form a 'clear conviction without hesitancy of the truth of the precise facts in issue.'" In re Adner G., 925 A.2d 951, 957 (R.I. 2007) (quoting Parker v. Parker, 103 R.I. 435, 442, 238 A.2d 57, 61 (1968)).

When this Court reviews an appeal from a decree of the Family Court, we must undertake an examination of "the record to determine whether legally competent evidence exists in it to support findings made by the trial justice." In re Adner G., 925 A.2d at 957 (quoting In re Mackenzie C., 877 A.2d 674, 685 (R.I. 2005)). "These findings 'are entitled to great weight and will not be reversed on appeal unless the trial justice overlooked or misconceived material evidence, or was otherwise clearly wrong.'" In re Mackenzie C., 877 A.2d at 685 (quoting In re Isabella C., 852 A.2d 550, 555 (R.I. 2004)). While bearing in mind this deferential standard, it is our role to scour the record "to determine if legally competent evidence exists to support" the trial justice's finding that there was clear and convincing evidence that Ms. Hebert abused and neglected Adrina. In re Veronica T., 700 A.2d 1366, 1368 (R.I. 1997) (internal quotation marks omitted).

## III

## Analysis

On appeal before this Court, Ms. Hebert contends that the trial justice "erred as a matter of law and abused her discretion" in making the above-summarized findings because she purportedly: (1) "overlooked and misconceived the evidence;" (2) "misread[] and erroneously rel[ied]" on two cases (viz., In re Vannarith D., 731 A.2d 685 (R.I. 1999) and In re Chester J., 754 A.2d 772 (R.I. 2000)); and (3) "ignor[ed] evidence contradicting her findings, and disregard[ed] uncontroverted evidence because she did not find the parents credible."

Having reviewed the record with particular care, it is our opinion that the trial justice erred in finding that Ms. Hebert abused and neglected Adrina; we have been unable to perceive in the record sufficient evidence that would satisfy the clear and convincing standard.

Preliminarily, the trial justice expressly noted that "[t]here [we]re too many unanswered questions" and "too many answers that d[id] not fit the facts as presented" in the instant case, especially her "[un]certain[ty] as to how [Adrina's] injury occurred," thereby manifesting her "hesitancy [as to] the truth of the precise facts in issue." In re Adner G., 925 A.2d at 957 (internal quotation marks omitted). While a "factfinder may always draw inferences from the evidence presented" when finding abuse, such "inferences must be based on some evidence, either direct, or circumstantial." Id. at 962 (internal quotation marks omitted). Here, Ms. Hebert testified that she was not present at the time of her daughter's injury, and no evidence to the contrary was presented.

Moreover, we are persuaded by Ms. Hebert's second contention to the effect that the trial justice "erroneously rel[ied]" on In re Vannarith D., 731 A.2d 685 and In re Chester J., 754 A.2d 772, both of which cases are clearly inapposite to the case before us. The case of In re Vannarith D., 731 A.2d at 689, involved a criminal defendant who challenged "the sufficiency of evidence establishing possession of the contraband;" we ultimately held that said defendant had been in constructive possession of the narcotic, as inferred from the totality of the circumstances, "notwithstanding the fact that the contraband was not in his * * * immediate physical possession." In the present case, while the trial justice correctly noted that she could "[d]raw[] inferences from established facts" in the course of her judicial fact-finding, she improperly cited In re Vannarith D. for the proposition that the state need not prove "which parent actually inflicted the abuse." Try as we might, we fail to comprehend how In re Vannarith D. is applicable to the instant matter.

With respect to In re Chester J., 754 A.2d at 777, which involved a petition to terminate parental rights with respect to a minor child on the basis of cruel and abusive conduct, it was

readily apparent that the evidence established that said child suffered "no fewer than nine rib fractures of various ages, indicating that they [had been] incurred over a sustained period." Notably, in that case this Court remarked that "the quantum and the obscene nature of the abuse was so overwhelming that the trial justice could not ignore the reasonable inferences to be drawn from the evidence."[8] Id. at 777-78  We held that "[a]llowing parents to ignore or to stand by while such abuse and neglect occurs is tantamount to the parents inflicting the abuse themselves * * *." Id. at 778.  As pointed out by Ms. Hebert in her appellate papers, the instant case is not reasonably comparable to the cited case.  There is nothing in the record that reflects a pattern of injuries "incurred over a sustained period." Id. at 777.  Rather, the injury incurred by Adrina, although significant, was a one-time incident, one at which Ms. Hebert was not present.

We further find ourselves persuaded by Ms. Hebert's remaining contention on appeal— viz., that the trial justice "overlooked" if not "ignor[ed]" material evidence "contradicting her findings, and disregard[ed] uncontroverted evidence."  In the trial justice's written decision, she expressly concluded that there was "uncontradicted medical testimony support[ing] the State's allegation of abuse and neglect" because, in her view, there were "absolutely no facts" to substantiate the explanation that Adrina had "fractured her femur from a fall off the bed." However, it is noteworthy that there did exist conflicting medical evidence at trial—namely the difference between the testimony of Dr. Adewusi on the one hand and that of Dr. Puleo and Dr. Doak on the other.  That medical testimony left it unclear whether Adrina's injury was inflicted

---

[8]     Although the state argues in its appellate papers that, based on In re Nicole B., 703 A.2d 612 (R.I. 1997) and In re Frances, 505 A.2d 1380 (R.I. 1986), "the State is not required to prove the identity of the perpetrator," nor should the presence of a parent at the time of the injury be a "deciding factor," we deem those two cases to be distinguishable.  Unlike the case at bar, both of the just-referenced cases affirmed abuse and/or neglect findings against respondent parents who offered no adequate explanation for their children's multiple injuries.  In re Nicole B., 703 A.2d at 617-18; In re Frances, 505 A.2d at 1384.

as a result of abuse or was merely accidental in nature. It was equally unclear whether petechiae could be caused by excessive crying alone. What was factually uncontested was Ms. Hebert's lack of presence at the time of Adrina's injury.

At the end of the day, although a trial justice's findings of fact are generally accorded "great weight," In re Mackenzie C., 877 A.2d at 685, the findings of the trial justice in this case are not supported by sufficient legally competent evidence and, therefore, constitute reversible error. In re Adner G., 925 A.2d at 962. In addition, to say without more extensive explanation that it was "bizarre and unusual" that Ms. Hebert was "conveniently" out of the house running errands when Adrina was injured or that Ms. Hebert did not specifically refer to her daughter by name during her testimony does not constitute an adequate predicate for the trial justice's finding of abuse and neglect in the instant case. Nor, it should be noted, should the fact that Ms. Hebert chose not "to touch, hug, hold or console" Adrina in the brief moment she had until the emergency responders arrived have served as an indication of any such neglect or abuse.[9] We conclude that, keeping in mind the pertinent standard of review, the evidence presented was insufficient to permit a reasonable inference to be drawn that Ms. Hebert abused and neglected Adrina.

## IV

## Conclusion

For the foregoing reasons, we vacate the decree of the Family Court as it pertains to Briana Hebert. The record in this case may be returned to that tribunal.

---

[9] It bears recalling that Ms. Hebert testified at trial that she decided not to touch Adrina at that time out of fear that doing so would "cause * * * more injury to her."

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| Title of Case | In re Adrina T. |
|---|---|
| Case Number | No. 2015-91-Appeal.<br>(P14-11-1) |
| Date Opinion Filed | June 22, 2017 |
| Justices | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| Written By | Associate Justice William P. Robinson III |
| Source of Appeal | Providence County Family Court |
| Judicial Officer From Lower Court | Associate Justice Karen Lynch Bernard |
| Attorney(s) on Appeal | For Petitioner:<br><br>Karen A. Clark<br>Department of Children Youth & Families<br><br>Andrew Johnson<br>Court Appointed Special Advocate<br><br>For Respondent:<br><br>Diana deGroof, Esq. |