April 12, 2022

**Supreme Court**

No. 2020-24-Appeal.
(K 17-4435)

In re Lucas D.                    :

NOTICE:   This opinion is subject to formal revision
before publication in the Rhode Island Reporter.  Readers
are requested to notify the Opinion Analyst, Supreme
Court of Rhode Island, 250 Benefit Street, Providence,
Rhode Island 02903, at Telephone (401) 222-3258 or
Email     opinionanalyst@courts.ri.gov,      of      any
typographical  or  other  formal  errors  in  order  that
corrections may be made before the opinion is published.

In re Lucas D.                    :

Present:  Suttell, C.J., Goldberg, Robinson, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**   The respondent mother, Kaitlyn D., appeals with respect to an October 31, 2019 decree of the Family Court which terminated her parental rights to her son, Lucas D.  She contends on appeal that "[t]he Trial Justice erred in deciding that [the Department of Children, Youth and Families (DCYF)] established by clear and convincing evidence that Kaitlyn [had] committed or allowed to be committed cruel and abusive conduct towards Lucas while in her care, and [was] unfit to parent Lucas."

For the reasons set forth in this opinion, we affirm the decree of the Family Court.

- 1 -

## I

## Facts and Travel

Lucas was born on June 21, 2017 to Kaitlyn and Anthony D. On the morning of September 3, 2017, Lucas was taken to the emergency department of Hasbro Children's Hospital due to "listlessness, low temperature, and fussiness." After an examination, it was determined that Lucas had bruises on his right arm, left neck, and abdomen. Following a head CT scan, it was also determined that Lucas had bilateral subdural hematomas.[1] Lucas's parents could not provide an accident history explaining his injuries, and there was no evidence of an underlying medical condition to explain his injuries. Accordingly, in her Report of Examination created September 3, 2017, the doctor who examined Lucas concluded that his injuries were consistent with child abuse and "abusive head trauma." The doctor further stated that Lucas would be "at imminent risk for harm if returned to his previous home environment."

On September 3, 2017, Kaitlyn and Anthony were interviewed separately by the Coventry police. Anthony acknowledged that he sometimes became frustrated, although he said that that had not occurred the previous night; he added that, when

---

[1] Amy Goldberg, M.D., who testified at trial, explained that such an injury involved bleeding around the brain, specifically in the subdural space.

he became frustrated, he would "kind of throw" Lucas into the "boppy lounger."[2] He further stated that he could be "a little rough" when he rocked Lucas. He said that that morning he had been frustrated and had given Lucas a "really tight hug," which he described as being "pretty tight for an adult." He said that he had done that six or seven times out of frustration and that such a hug would "probably hurt some of the people [whom he knew]." He also described it as enough to make an adult "wince in pain," and he acknowledged it was "way [too] tight for an infant." He added that, prior to going to Hasbro, he had grabbed the Boppy lounger with Lucas in it and had swung him around. He described the action with the Boppy lounger as being similar to "driving a car" and "pretty quick[]." He added that he "wasn't trying to damage him." But he further added that it was "probably like getting hit by a car from the side * * *." Anthony stated that he did not remember shaking Lucas, but he said that it was "possible" because he "may have pulled him to [his] chest quick * * *." He added that he "kn[e]w it's bad * * *."

In her interview, Kaitlyn stated that "all [she] kn[e]w [was] that [Anthony] said he did not do anything" and that she "believe[d] him." Kaitlyn provided alternative explanations for Lucas's injuries. She stated, for example, that Lucas had sustained the head injuries from bouncing around in his stroller or when he hit his head on the morning of September 3; she added that the bruising could have

---

[2]     Kaitlyn testified at trial that a Boppy lounger is "a round pillow that the baby can rest in" with a "cushion for [his] head."

been caused by his car seat.[3] It was her statement that, if Anthony hurt Lucas, it was "without him even realizing it" or was a "complete accident." She stated that she had never been concerned about Lucas's safety when he was with Anthony.

On September 6, 2017, DCYF filed a petition alleging that: (1) Lucas's parents had "failed to provide said child with a minimum degree of care, supervision, or guardianship;" (2) Lucas was "without proper parental care and supervision;" (3) Lucas's parents had "inflicted or allowed to be inflicted upon the child, physical injury;" and (4) Lucas's parents "created or allowed to be created a substantial risk of physical injury to [Lucas]." A probable cause hearing ensued, and the trial justice found probable cause to remove Lucas from his parents' care.

On November 6, 2017, DCYF filed a petition seeking to terminate the parental rights of Anthony and Kaitlyn on the grounds that they were unfit pursuant to G.L. 1956 §§ 15-7-7(a)(2)(ii), 15-7-7(a)(2)(v), and 15-7-7(a)(2)(vi).[4]

A trial took place over various dates from December 10, 2018 to March 28, 2019. We relate below only the salient aspects of what transpired at that lengthy trial.

---

[3] When Kaitlyn was interviewed at Hasbro, prior to the interview with the police, she also attributed a bruise on Lucas's arm to "tight fleece clothing" that was hard to remove, and she attributed an abdominal bruise found on Lucas to a "clip-on baby monitor * * *."

[4] We note that Lucas's father, Anthony D., voluntarily terminated his parental rights before trial; therefore, we are concerned in this case only with the respondent mother's parental rights.

- 4 -

**The Testimony of Kaitlyn**

Kaitlyn testified that, on September 3, 2017, at 5:00 a.m., her son Lucas woke up and wanted to be fed. She testified that both she and her husband, Anthony, "got up." She stated that she determined that Anthony "had it covered" and that therefore she put in ear plugs and went back to sleep. It was further her testimony that she next woke at 6:30 a.m. to the sound of Lucas crying loudly, as though he was in pain. She testified that she found Anthony changing Lucas on the changing pad in Lucas's room. She stated that Lucas's stomach was "gurgling" and that she therefore gave him Mylicon drops (which she also referred to as "gas drops"); she added that Lucas had "a lot of gastrointestinal issues and issues with formula * * *." She testified that Lucas then "pooped" and became "kind of lethargic."

Kaitlyn added that Lucas was whimpering. She further testified that he looked sweaty and slightly pale and that his temperature was around ninety-four degrees. She stated that she was concerned and decided to take him to Hasbro. It was her further testimony that she took a video of Lucas on her phone to show to the doctors "in case [Lucas] wasn't acting that way when [they] arrived at the hospital." After she recorded the video, which was entered as an exhibit at trial, she called the pediatrician's office; she added that a nurse from that office returned

her call and agreed with her plan to take Lucas to Hasbro. It was Kaitlyn's testimony that she, Anthony, and Lucas arrived at Hasbro at 7:20 a.m.

Kaitlyn added that, on that morning, Lucas had hit his head on the dresser when he arched his back and his head then "slid off the changing pad * * *." She stated that Anthony grabbed Lucas "really quick" by both arms.[5]

Kaitlyn explained Lucas's injuries at trial when she testified that the bruising on Lucas's stomach resulted "from where the snooze alarm monitor was" and that the petechiae[6] on his neck were from his car seat. It was her further testimony that she told doctors at Hasbro that the bruising on Lucas's arms resulted from Anthony grabbing him after he slipped off the changing pad or when they removed his clothing. She also testified that she told the doctors that Lucas's head injury must have happened on the bumpy stroller ride the day before[7] or when he had hit his head on the dresser on the morning of September 3.

It was Kaitlyn's testimony that the doctors told her that Lucas's injuries were indicative of child abuse. She also testified that she had told Anthony to be "'more gentle'" with Lucas, and she stated that he would shift the baby from arm

---

[5] Kaitlyn also testified at some length about the days preceding Lucas's injuries, which testimony, for the purposes of this appeal, we need not narrate.

[6] Doctor Goldberg testified that petechiae are "[b]roken blood vessels at the top of the skin" and that they "present as tiny little red dots."

[7] John Barletta, a DCYF investigator, testified that Lucas's stroller was in "very new condition" with a "2-inch pad" and rubber wheels.

to arm "just a little bit more animated than [she] would do." She added that she never saw Anthony act in a manner that made her uncomfortable with respect to Lucas.

It was Kaitlyn's testimony that the Coventry police did not tell her that Anthony had confessed "to anything" and that Anthony did not tell her that he had hugged Lucas so tightly that it would hurt an adult. She further testified that she never saw Anthony give Lucas a bear hug or swing him back and forth in the Boppy lounger. However, she did acknowledge that the police told her that Anthony may have said something to them that would explain how the injuries to Lucas were caused. She stated that she had a copy of Anthony's interview with the Coventry police, but she added that she had only "flipped through it" and did not "read it in full * * *." When asked why she had not read it, she replied that she did not know why; however, she added that she did read the police report. She further added that she saw only a ten-second clip of the video recording of Anthony's interview with the police while she was at the police station. However, she acknowledged later in her testimony that, after Anthony gave his statement to the police on September 3, she knew that he had admitted to having given Lucas a "bear hug" of the kind that might hurt an adult. She also acknowledged that she had read in the police report that Anthony swung Lucas around in his Boppy lounger.

Kaitlyn stated at trial that she and Anthony separated after he was arrested and arraigned for first-degree child abuse in September of 2017 and remained separated until the time when she was diagnosed with Ehlers Danlos Syndrome[8] (EDS); she stated that Anthony moved back into the marital domicile in August or September of 2018. Kaitlyn added that "multiple doctors, very sought-after, very accomplished doctors" told her that Lucas had a fifty percent chance of having inherited the disease and that it could "cause all of the symptoms that Lucas had." However, she acknowledged that Lucas had not been diagnosed with EDS as of the date of her testimony. Moreover, when directly questioned, she could name only two doctors who she claimed had provided her with that information, and she testified that neither doctor had actually examined Lucas. She stated that they were the only two doctors with whom she had "personally had conversations," but she added that she had "researched online."

Kaitlyn testified that, as of the time of her testimony, she had filed for divorce from Anthony.[9] She stated that she was "blindsided" by Anthony's voluntarily terminating his parental rights and admitting responsibility because she

---

[8] Doctor Goldberg explained that EDS is a "genetic problem" regarding connective tissue. She added that it has thirteen different types, only some of which can be discerned through genetic testing.

[9] We note that Kaitlyn testified, on December 17, 2018, that she had filed for divorce from Anthony on December 7, 2018. The record reflects that she signed the complaint for divorce on December 7, but it was not ultimately filed until December 14.

had "had no reason to suspect [that Anthony] had done anything" until then. When asked if she believed that Anthony did what he had told the police he had done, she said that she did not "know what to believe." When asked whether, after reading the police report, she knew that Anthony became frustrated with Lucas, she stated that she had "never seen [Anthony] be violent with [her] son." When asked whether she accepted the medical conclusion that Lucas was physically abused, she responded: "I don't know." She was asked if she accepted the "explanation of your husband that he did it," and she responded: "He didn't admit to doing anything, so no." She stated that, at the time of trial, she still did not "know how [Lucas's] injuries happened or what caused them."

**B**

**The Testimony of Amy Goldberg, M.D.**

Doctor Amy Goldberg testified as an expert in child abuse pediatrics. She testified to having examined Lucas and to having found bruising on his right arm, petechial hemorrhage near the left side of his neck with swelling to his left shoulder, and some bruising on his abdomen. It was her testimony that bruising in a non-mobile infant of Lucas's age raised concerns for "inflicted trauma;" it was further her testimony that Lucas could not have inflicted his injuries on himself. She stated that the bruising on Lucas's abdomen would not have been caused by an infant monitor.

Doctor Goldberg further testified that a CT scan revealed (and a MRI confirmed) bilateral subdural hemorrhages. She added that an ophthalmological exam revealed diffuse retinal hemorrhaging in both eyes. It was Dr. Goldberg's testimony that Lucas's blood screening test results were normal and that there was no indication from his medical history that he had a bleeding disorder. It was her testimony that the subdural hematomas and the retinal hemorrhages were "consistent with a rotational force on [Lucas's] brain and head."

Doctor Goldberg further testified that twisting Lucas's head left and right would not cause his injuries but that impact on a soft surface could explain his injuries. She added that swinging a baby in a Boppy lounger, if the baby was placed in the lounger in such a way that his head was not supported, could have caused Lucas's injuries. She further added that excessive hugging, a fall off a changing pad and bumping his head, and a bumpy stroller could not explain his head injuries. She also testified that she informed Kaitlyn that Lucas's injuries could not have been caused by a bumpy stroller ride. She added that it would be "outside of normal caregiving" with respect to dressing and undressing an infant to cause bruising, but she added that it would depend on "how it was done." It was her testimony that she could not definitively determine when Lucas's injuries occurred, but she did state that it "happened within a time period where the child became symptomatic * * *."

Doctor Goldberg went on to testify that she explored with a geneticist whether or not Lucas had a genetic condition which caused his injuries. It was Dr. Goldberg's testimony that she examined Lucas again in January of 2018 when he was admitted to the hospital due to the fact that his then-caregivers were concerned about "possible seizure activity." She added that, after an examination, a CT scan, and a MRI, it was clear that he did not have any new injuries. However, she asked for the "hematology group" to evaluate him for "any underlying bleeding disorder that would predispose him to any type of bleeding or being vulnerable to bleeding." Doctor Goldberg detailed some bleeding disorders for which Lucas was tested. She testified that Lucas's blood tests came back normal.

Doctor Goldberg testified that she was aware that Kaitlyn had been diagnosed with EDS, specifically a "hypermobility EDS." It was Dr. Goldberg's testimony that she had submitted a letter to the court as to whether or not Lucas should be examined by two specific doctors with respect to a possible EDS diagnosis. She stated that she opined that Lucas should not be examined based upon her evaluation and the evaluation of the other specialists he had seen. She added in her testimony at trial that hypermobility EDS did not have "relevance to * * * subdural hemorrhage and the retinal hemorrhages he had;" according to Dr. Goldberg, there were no reported cases of hypermobility EDS causing subdural or retinal hemorrhaging in an infant. However, it was her further testimony that

Lucas was ultimately evaluated by Joan Stoler, M.D., with respect to whether or not he had EDS. She stated that the results of that evaluation did not change her opinion as to what caused Lucas's injuries.

It was Dr. Goldberg's conclusion that, to a reasonable degree of medical certainty, Lucas's injuries were caused by abusive head trauma and physical child abuse.

As Dr. Goldberg referenced in her testimony, Lucas was seen for a genetics visit on November 13, 2018 at Boston Children's Hospital by Dr. Stoler for an evaluation as to whether or not he might have EDS. According to the final report created after that visit, Dr. Stoler concluded that Lucas did not have hypermobility out of proportion with his age, but she noted that it is difficult to diagnose hypermobile EDS in young children. However, she also opined that that type of EDS, while it could cause increased bruising, did not typically result in subdural hemorrhage. According to the final report, Lucas tested negative with respect to having genes associated with a vascular form of EDS, making a diagnosis of that form of EDS "much less likely."

## C

### The Testimony of Anthony

The only portion of Anthony's testimony of pertinence to this appeal is the fact that he stated at trial that he spoke to Kaitlyn "[d]aily, every other day." He

described them as "[c]urrently" a couple, and he said that they love each other. Specifically, he testified that Kaitlyn had told him that she loved him "[a] couple days ago." He also stated that he had slept at her house about a week and a half or two weeks before his December 19, 2018 testimony.

## D

### The Testimony of Detective Sergeant Alex DeMolles

Detective Sergeant Alex DeMolles, who investigated the case for the Coventry Police Department, testified that he interviewed Anthony on September 3 and that Anthony "eventually pretty much confessed and demonstrated" how he had handled Lucas. He further testified that, on September 5, 2017, Kaitlyn returned to the police station with her mother and was informed of what Anthony had told the police. He stated that, in his opinion, she was in "denial" or "disbelief." The detective stated that Kaitlyn was shown a video of the portion of Anthony's interview in which he disclosed his actions to the police and demonstrated how he had handled Lucas, and he said that her reaction was "blunt" or "muted."[10]

On October 18, 2019, following the conclusion of the trial, the trial justice issued a written decision finding Kaitlyn to be unfit and determining that her parental rights should be terminated. A decree terminating Kaitlyn's parental

---

[10] Numerous additional witnesses testified at trial; but, for the purposes of this opinion, we need not relate their testimony.

rights entered on October 31, 2019. She filed a timely notice of appeal on the same day.

## II

## Standard of Review

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Rylee A.*, 233 A.3d 1040, 1049 (R.I. 2020) (internal quotation marks omitted); *see In re Chester J.*, 754 A.2d 772, 776 (R.I. 2000); *see also In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019). The trial justice's findings "are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *In re Rylee A.*, 233 A.3d at 1049; *see also In re Adrina T.*, 162 A.3d 658, 668 (R.I. 2017). Nevertheless, it should be borne in mind that the findings of the trial justice "must be supported by clear and convincing evidence." *In re Violet G.*, 212 A.3d at 166.

# III

# Analysis

# A

# The Decision of the Trial Justice

The trial justice issued a written decision on October 18, 2019. She initially provided an extensive and comprehensive recounting of the relevant trial testimony. The trial justice then began her discussion by noting that DCYF was required to prove its allegations by clear and convincing evidence. She stated that she was "mindful of the fact that the termination of a parent's right to their child is without question the most difficult decision a Family Court judge will have to make" and that it was "an awesome and permanent decision that [she took] tremendous responsibility for." Nonetheless, she added that "the safety and protection of [the] child" was the "utmost concern * * *."

After reviewing the testimony of the witnesses and the other evidence in the record, the trial justice noted that the "entire trial testimony of [Kaitlyn] was the denial and rejection" of the medical evidence. She added that, despite seeing a videotape of her husband's police interview in which he admitted to abusing their son and despite hearing the opinions of the doctors about what caused Lucas's injuries, Kaitlyn still "insisted that [Lucas's] injuries were caused by some medical or genetic issue." The trial justice found that Kaitlyn's "lack of awareness and

insight" with respect to Anthony's confession and her "crusade" and "grasping at straws" to find a reason other than Anthony's actions for the injuries to her son showed a lack of protective capacity. She noted that Kaitlyn and Anthony had remained married and, despite a "short period of time apart, continued to live together." She added that she found Kaitlyn's testimony to be "self-serving and not credible."

The trial justice additionally noted that testimony at trial indicated that Lucas was bonded with his pre-adoptive family, which was willing to offer him permanency.

The trial justice then made specific findings, which included a finding that Kaitlyn had "allowed to be committed cruel and abusive conduct towards Lucas" and had continued to "support and stand by" Anthony despite the evidence in the case. She also found that Kaitlyn continued to reject the uncontradicted medical testimony that Lucas's injuries were the result of child abuse and the "overwhelming evidence" that Anthony caused Lucas's injuries. The trial justice accordingly found Kaitlyn unfit to parent Lucas, and she terminated her parental rights.

**B**

**Discussion**

Kaitlyn contends on appeal that the trial justice erred in deciding that DCYF had established by clear and convincing evidence that she allowed to be committed cruel and abusive conduct towards Lucas and was unfit to parent him. She contends that she did not "ignore medical evidence" and that she did not continue to live with Anthony; she points out that she testified that she and Anthony lived apart for about a year after Lucas was removed from their custody and that she filed for divorce in December of 2018. She further posits that Anthony never told her that he had harmed Lucas, and she adds that "two prominent physicians" allegedly told her that Lucas's injuries could have been the result of Lucas having EDS. (We note, however, that there is no evidence in the record that he has ever been diagnosed with that condition.) Kaitlyn avers that Lucas is being taken from her based only on her "uncertainty and her initial disbelief."[11]

We have stated that "[n]atural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Rylee A.*, 233 A.3d at

---

[11] We note that Kaitlyn further contends that the trial justice "made medical conclusions without any medical evidence" and that Kaitlyn's "response on the morning of September 3, 2017, was both immediate and completely appropriate, contrary to the findings of the Trial Justice."

1051 (internal quotation marks omitted);[12] *see Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982); *see also In re Violet G.*, 212 A.3d at 166. That interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky*, 455 U.S. at 753.

General Laws 1956 § 15-7-7(a)(2)(ii) provides that a court shall "terminate any and all legal rights of the parent to the child" if the court finds by clear and convincing evidence that the parent is unfit by reason of conduct "seriously detrimental" to the child, such as "conduct toward any child of a cruel or abusive nature[.]" Thus, under that statutory section, before terminating parental rights, a court must first find a parent unfit by reason of having committed conduct of a cruel or abusive nature toward the child. *In re Rylee A.*, 233 A.3d at 1051; *see In re Rosalie H.*, 889 A.2d 199, 204 (R.I. 2006) ("Absent a finding of unfitness, the natural parent's right to bear and raise their child in a less than perfect way remains superior to the rights of foster parents who may be exemplary nurturers.") (internal quotation marks omitted); *see also In re Nicole B.*, 703 A.2d 612, 615 (R.I. 1997) ("[R]emoval of children from a biological parent without a finding of unfitness would be constitutionally repugnant."). A further relevant principle is that "[i]f a

---

[12] We note that Kaitlyn, in her reply brief before this Court, contends that analogizing the facts of the instant case with those of *In re Rylee A.*, 233 A.3d 1040 (R.I. 2020), is "preposterous * * *." We rely on our opinion in *In re Rylee A.* simply for the background legal principles which inform an analysis of a petition to terminate a parent's parental rights; in so doing, we do not mean to suggest that the facts in the two cases are similar.

Family Court justice determines that a parent is unfit under § 15-7-7, the best interests of the child outweigh all other considerations." *In re Rylee A.*, 233 A.3d at 1052 (internal quotation marks omitted); *see also In re Rosalie H.*, 889 A.2d at 204.

In conducting our review, we will look initially at the trial justice's finding of parental unfitness. In scrutinizing that determination, we remain keenly aware that "[g]iven the drastic and irreversible nature of a termination of parental rights decree, the right to due process requires that the state support its allegations by clear and convincing evidence." *In re Rylee A.*, 233 A.3d at 1051 (internal quotation marks omitted); *see also In re Violet G.*, 212 A.3d at 166. We have explained that "[i]t is well settled that the clear and convincing standard is a higher standard of proof than that of a fair preponderance of the evidence but less than that required for proof beyond a reasonable doubt." *In re Sophia M.*, 204 A.3d 605, 609 (R.I. 2019) (internal quotation marks omitted). The clear and convincing evidence standard "requires that the fact-finder form a clear conviction without hesitancy of the truth of the precise facts in issue." *Id.* (internal quotation marks omitted); *see also In re Madlyn B.*, 187 A.3d 1105, 1118 (R.I. 2018).

We have reviewed the lengthy testimony in this case, as well as the exhibits, the decision of the trial justice, and the contentions of the parties. Having done so, it is our view that the conclusion of the trial justice that Kaitlyn is unfit is

supported by legal and competent evidence in the record and that the trial justice did not overlook or misconceive any material evidence. *See In re Rylee A.*, 233 A.3d at 1049. Therefore, we give great deference to the conclusions of the trial justice. *See id.*

The trial justice specifically concluded that Kaitlyn had refused to accept the medical evidence that her son was the victim of child abuse and refused to believe the evidence that her husband had inflicted that abuse. Those facts led to the conclusion of the trial justice that Kaitlyn lacked protective capacity and had caused to be committed cruel and abusive conduct toward Lucas. We are unable to hold that the trial justice erred in reaching that conclusion.

Kaitlyn testified at trial about various alternative explanations for her son's injuries, including EDS—a medical disorder with which Lucas had not been diagnosed and which Dr. Goldberg testified would not explain all of his injuries. Kaitlyn did so in the face of the medical evidence, seeing a portion of the video of her husband confessing to inflicting Lucas's injuries, and reading the police report. We note as well that she testified that she was in possession of the transcript of Anthony's police interview in which he confessed; but, rather surprisingly, she did not read it in full. Despite all evidence to the contrary, Kaitlyn testified that she did not "know what to believe" with respect to whether or not Anthony had done what he told the police he did to Lucas. She testified that, despite all of the

medical evidence indicating that Lucas's injuries were caused by abuse, she still did not know if she accepted that medical conclusion. And, she also testified that she did not accept the "explanation of [her] husband that he did it * * *." In light of the lengthy testimony of Dr. Goldberg detailing Lucas's injuries, Dr. Goldberg's medical conclusion (to a reasonable degree of medical certainty) that those injuries were the result of child abuse (and were not consistent with the explanations provided by Kaitlyn) coupled with the fact of Anthony's confession, Kaitlyn's testimony demonstrates a decided lack of protective capacity.

What is more, the trial justice found that Kaitlyn continued her relationship with Anthony even after she was made aware of his confession. It is true that she testified that she and Anthony did live separately for a while after Lucas was removed from their custody and that, at the time of trial, she had recently filed for divorce. However, it is worth noting that the divorce action filed by Kaitlyn never resulted in a judgment of divorce and that the trial justice specifically found her testimony at trial not to be credible. *See In re Madlyn B.*, 187 A.3d at 1120 (stating that this Court accords "great deference" to the credibility determinations of a trial justice). Moreover, Anthony testified at trial that he and Kaitlyn were currently a couple and loved each other. We further note that, at oral argument before this Court, Kaitlyn's counsel acknowledged that Kaitlyn and Anthony were continuing to live together as husband and wife.

All evidence in this case led to the conclusion that Lucas suffered abuse at the hands of his father. Accordingly, Kaitlyn's refusal to accept that fact coupled with her continued relationship with Anthony (which would certainly mean that Anthony would be in the presence of Lucas) is competent evidence on which the trial justice could have found by clear and convincing evidence that Kaitlyn lacked protective capacity, committed or allowed to be committed cruel and abusive conduct toward Lucas, and was an unfit parent.[13]

Finally, having addressed the issue of parental unfitness, we turn our attention, as did the trial justice, to the best interests of the child. As we have previously stated, that consideration "outweighs all others." *In re Adele B.*, 229 A.3d 671, 685 (R.I. 2020) (internal quotation marks omitted). "The best interests of the child analysis always focuses on the rights of the child to reasonable care and maintenance, freedom from abuse or neglect, and an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." *Id.* (internal quotation marks omitted). At trial in the instant case, Carl Desjarlais, a social caseworker for DCYF, testified that Lucas had been placed in a pre-adoptive home and that, in his opinion, it was in Lucas's best interests to be adopted by that foster family. The trial justice then specifically

---

[13] Due to the fact that we perceive no error in the trial justice's determinations, we need not address any of Kaitlyn's additional contentions relative to errors allegedly committed by the trial justice with respect to the issue of parental unfitness.

found that Lucas was bonded with his pre-adoptive family and that that family was willing to offer him permanency. That finding strongly supports the trial justice's conclusion relative to what would be in the best interests of the child. We note as well that Lucas was ten weeks old when he was removed from his parents' care; he is now almost five years old and deserves permanency.

Accordingly, we affirm the trial justice's decree terminating Kaitlyn's parental rights.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the decree of the Family Court. The record may be returned to that tribunal.

Justice Lynch Prata did not participate.



STATE OF RHODE ISLAND

SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | In re Lucas D. |
| **Case Number** | No. 2020-24-Apppeal.<br>(K 17-4435) |
| **Date Opinion Filed** | April 12, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Kent County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Karen Lynch Bernard |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Dianne L. Leyden<br>Department of Children, Youth & Families<br><br>Laurel C. Ferrelli<br>Court Appointed Special Advocate<br>For Respondent:<br><br>James S. Lawrence, Esq.<br>Andrew J. McKay, Esq. |